Our next case is TYPHOON TOUCH v. DELL. TYPHOON TOUCH v. DELL Mr. Wolf? Yes. I would like to please applaud Charles Wolf for playing at that appellate TYPHOON TOUCH technology today. The district court's claim construction that's on appeal in this case are based upon a fundamental misunderstanding of the invention, overlooking one of the most significant features of the invention, which is a device that allows the user to create and install a software application called a data collection application, we refer to as DCAs for short, on the device itself after the device has been purchased. So that depends on what our reading of the specification and the claims, whether or not it suggests that an inherent part of this invention included the DCAs or not? It included the capability of storing a DCA on the device after the device has been purchased by the user, him or herself. Well, that's the issue, whether it included just the capability or if an inherent part of the invention included the DCAs installed, correct? That's correct. And we submit that the intrinsic evidence shows that this was a very important feature of the invention and was understood by the... What was an important feature, the capability for DCAs or the DCAs installed? The fact that the user could install a DCA, him or herself, using the device that has an application generator on the device, so the DCA did not have to be on the device initially. The DCA is referred to in virtually all the claims, right? Yes, the term DCA appears there as a feature of the invention, but it's the capability of being able to put the DCA on the device that is an important feature of this invention. How do we know that? Point us to what in the spec or the claim language should persuade us that this capability exists. Well, let me start off by saying that the patent examiner, when he allowed the patents, wrote an abstract as an examiner's amendment to the patent to explain what the invention was. And in the abstract, the examiner wrote, an application generator allows the user to develop data entry applications by combining the features of sequential libraries, consequential libraries, etc. So the examiner understood that the user, using the application generator that is an element of the claim, could create the DCA and store it in the memory of the device so that the memory only had to have the capability of receiving that DCA that was then created by the user. The spec also says the same thing, describing the data collection application. But doesn't your proposed construction really almost destroy the invention because it would also then cover a general purpose computer which is capable of generic memory and processor downloading and capable of storing and executing a DCA? Well, but the claims have other elements to Judge Rader. The claims call for an application generator. The versatility of this device was a very important feature of the invention. In the background of the invention section, the patentee points out that prior art, and again, this is 1988, by the way. I think it's important to remember that we're talking about 1988, not 2010, when the advances in computers make things that were back in 1988, not new and not obvious, look possibly trivial. But we're talking about in 1988, and in 1988, the data collection devices were pre-programmed, single-use devices that had very limited memory and therefore would not have the capability and the versatility of the device of this invention that had a memory that was capable of storing a DCA that could be created by the user using the application generator that is also on the device. What about the operating in conjunction language? Well, again... With a runtime utility? When the device is loaded with a DCA, clearly, yes, then it has to have the capability of running that DCA. And again, it's a capability of the device operating in conjunction with the operating system to run the DCA. So if there's no DCA, would you say they could be infringing devices that don't have DCA? Then you're saying that they infringe, notwithstanding that they don't meet any of these limitations because these limitations don't apply. Is that your view? Well, the limitations in terms of the capability limitate. I mean, it still has to have an input-output device that has the capability. It has to have a memory that has the capability of storing the DCA. It has to have a CPU that is capable of executing the DCA. And it has to have, I'm looking at claim one now, an application generator on the device. But the invention isn't operating unless you have the claimed apparatus operating in conjunction with the runtime utility, right? Well, you're talking about... Operating in conjunction with. Operating. Is that pretty active direct language? That is active direct language, but it's stating a capability, how the device works when it's functioning with the DCA loaded on the device. That is what operating in conjunction with. When you read the patent specification... But you don't even have the claimed invention if you don't have that, right? Because it's got to be operating. Well, that's the central issue here. I'm struggling to understand. I guess I'm not understanding how you translate the active language operating in conjunction with into language capable of operating in conjunction with. Well, because take the runtime utility, for example. The claim says that the runtime utility operates in conjunction with the processor to execute the DCA. So if there's not a DCA on the device until the user loads it on the device, there's nothing for it to operate in conjunction with. So clearly when you read, you interpret the claims in light of the intrinsic evidence, the patent specification, the claim language, it's clear that operating in conjunction with means you're explaining how the device operates when there's a DCA loaded on the device. So all of these limitations don't apply to many, many uses of what you say would be infringing devices. If the infringing devices don't have a DCA, they would still be infringing because we would just ignore those limitations therefore for everybody who doesn't have a DCA? If they have the capability. Again, it's not that... But again, isn't that every general purpose computer? They all have the capability, don't they? Well, today they may. In 1998, when this invention was filed, this was a novel and non-obvious invention. You did not have devices that had memory, that had the capability of storing DCAs and processors. That's really what's troubling me. How can... There's an interesting idea, but neither the inventors nor anyone else had the capability of carrying it out. How can that be a valid patent? That's what this invention was. The inventors came up with a device that had that capability when the prior art did not. And another point to be made on this, I really think... Let's pursue that. You say they actually had produced, developed a device with this capability? It is described... I thought I heard you say that the technology evolved later. My position is, and I think the patent is clear, that a device did exist. It's described in the patent in great detail, including how you create DCAs using the application generator. So that was the invention. The inventors coming up with a very powerful, portable device that allowed you to run these DCAs differently from how they were being run in 1988 when they had to be very pre-programmed, specific-use devices. Now, if, in fact, the defendant's appellees in this case can show that in 1998 there were devices out there that were general-purpose computers that could do everything that's required in the claim, well, then the claim is invalid. But that is an issue for trial on the affirmative defense of invalidity. It's not an issue for claim control. If we conclude that there is a requirement that DCAs be installed in order for there to be infringement, does that end this case? I mean, is there any dispute with the accused products that are sold do not include installed DCAs? We stipulated non-infringement based upon the court's claim construction, which said that the device had to be actually in operation and actually had to have a memory storing a DCA for there to be infringement. And so we've stipulated non-infringement to that, Your Honor. Would you like to save your rebuttal time, Mr. Wolf? Let me make one quick point with respect to the means for cross-referencing. That now was a decision of invalidity on summary judgment. And there, our point to be made that that's a different standard, obviously. The judge, in finding summary judgment that the term means for cross-referencing was indefinite, had to hold that there was undisputable, clear and convincing evidence that no one of ordinary skill in the art would recognize that there was an algorithm disclosed in this package. I thought, didn't you concede that there was no algorithm disclosed? I know in the briefing towards the end, we talk about pictorial depiction versus non-pictorial depiction. Wasn't there a concession made? What we stated in our briefing, there was no explicit disclosure of an algorithm. In other words... There's a disclosure of a non-explicit... I mean, what's the difference between an explicit disclosure and a non-explicit disclosure? An explicit disclosure is here is the algorithm, algorithm here, or a flow diagram in the figures of drawings and the algorithm is depicted in the figures of drawings. What about the blue brief at 49 and 50? They give us just exactly that, a kind of a flow chart. What we did there is to show that when you take the prose, that's in column 14 of the spec, and you take the prose, you can make a flow diagram that uses the exact words that are in the specification and that shows that you get a four-step algorithm, which is enter a response, search in the library, determine if there's a match, and execute a response. If that diagram that uses the exact words that are in the spec was a figure in the pattern, we wouldn't be here. Can I just ask you a logistical question? Under what circumstances would we reach this? Because this indefiniteness was an affirmative defense, right? It wasn't a counterclaim? It was an affirmative defense, correct. So if we were to affirm on the keyboard issue or any of the other issues, we don't necessarily have to reach this question, right? Because the same claims go down on infringement. I believe they're in different... That may be the case, Your Honor. I don't know the exact claims because there are a lot of different scenarios depending upon which claims are which. So I can't speak to that right now. Okay. Would you like to save your time, Mr. Wolfe? Thank you. Thank you. We'll hear from Mr. Reines. May it please the Court, Edward Reines from Weill Gotschall representing Applin on behalf of Appellees. The way we've provided the argument, I'll be addressing the forestoring, foreprocessing, and operating in conjunction with the claim limitations, and Mr. Ray will address the rest. What I'd like to first address is Judge Prost's comment regarding the DCAs. DCAs are present in all claims, so it's absolute. The primary argument that I understood from counsel as to why the infringement theory of Calhoun that there need not be a DCA on these computers at all is he placed a lot of weight on the application generator, the business generator that's referenced in the specification. There are four claims against Appel. None of those have any reference to an application generator. In fact, if you look at Claim 14 of the 057, basically what's claimed is a general-purpose computer. There's an in-and-output device. Every computer has that. There's a memory. Every computer has that. There's a processor. Every computer has that. He argued that general-purpose computers couldn't do this at the time of this invention. And that's inconsistent with the background section of the patent where they specifically acknowledge that there were computers at the time and where they identify the DCA as the critical element. That's throughout the summary of the invention section. And that's documented heavily in our brief. But a quick review of the summary of the invention confirms that without any question. Can you give me the site on that background of the invention? Yeah, it's column 2. I direct you to starting at line 24, and this is referring to the 057. So the... And extends through down to the bottom, but I'd identify line 44, which says, Briefly, according to the first aspect of the invention, an improved portable computer is provided which is specifically adapted for facilitated data collection and recordation. Specifically adapted. Not a general-purpose computer that can do anything. But even if the chapter and verse in this specification making clear that the DCA is central to the invention wasn't enough, what is overwhelming is the file history. In the file history, in 1991, after three years of penance, a new set of claims was added. Claim 16 is the beginning of the claim set. And in that office action, there was an attempt by the applicant to gain the very coverage they're now seeking through claim construction and appeal. And in that amendment, and if you want to look at it, it's A5168 of the record, it pointed out the CPU has an application generator for generating any desired application. So there's no reference to a DCA at all. And it said that the computer, this handheld computer, could run any of a plurality of applications. So no reference to a DCA. So there was an attempt. Rejected. Rejected three times based on the Smith reference. And in the file history, the patent office says, Smith gives us a computer capable of basic operation of an application, and it's nimble and handheld, and it's got a touch screen, and the very few limitations that are in the claims under the reading that we're now hearing about from Typhoon. And three times they added in more and more, and then finally, in 1994, after, like I say, three or four rejections, an additional reference was included, the Day reference, it was the Day and the Smith reference at that point. Even more was added, including the operating in conjunction language identified by Chief Judge Rader. And finally, after all of that, the patent office permitted the claims, only with the DCA application and other very specific things about the library that are now attempting to be read out. Let me shift the focus a little. There's a lot of back and forth in the briefs about capability versus use and apparatus claims and our cases in cross-medical and so forth. Am I wrong that you're not arguing that if you have the DCA installed, that the only way that can be infringement is if you're actually operating it? You would agree that as long as you have the DCA, it just has to have the capability of doing it. It has to be pleasurable. But it doesn't actually be used. That's right. And that's correct. And to take the example that was given, you heard Townsville say that... He tacitly conceded that every general-purpose computer now would meet this claim requirement. That all it is is memory and a processor, right? We're talking about the processor limitation for processing and for storing. That somehow any system that has a processor and memory that's hand-held, that's got a touchscreen, is covered by this PAC. And that's violently inconsistent with the specification and the file history that I just walked through. And I would add one more thing on the file history because it's important. In the May 1994 amendment, the final amendment, they state that the reason that the claim should be allowed is that neither Smith or Day, the same reference that was coming up in all the other rejections, the reason why it should be allowed is because neither of them disclose or suggest the operations of the computer as claimed in the present invention. So they said because of the way it operates. And there's even reference to the significant limitations of the DCA. So for them to be able to come now to a district court and say, we can cover any computer, basically, that's a hand-held, and there's no need for it to ever have a DCA. And on that issue, this isn't just the court was confirming that if the claim construction doesn't change that there's an affirmance appropriate. Their position in the district court was, we don't have to identify any DCA in the third party anywhere. We refuse to identify any DCA. We went and negotiated a stipulation with them that says, you are not identifying any DCA. You've got all the rights of discovery in district court. You are not. You have agreed and stipulated that you will not identify any DCA at all because you won't tell us what it is. And they agreed. They said, we don't need just the ability to have a general-purpose device that could be added to DCA. If we agree with the district court on the claim construction for memory means and the others, do we even need to reach the cross-referencing in the new position? I wouldn't want to tread on Mr. Ray. So I think I'll leave that for him to address. But I can say for certainty that if the claim construction is confirmed on the processing, for processing, and I think also for storing because everyone's treating them together. You've seen that throughout the record. I think Judge Davis did that when he issued his claim construction. That kills the infringement claims across the board against all the defendants on all the different claims in both patents. All right? Unless there are questions from the panel, I think I'll let Mr. Ray address his issues. Thank you, Mr. Reines. Mr. Ray. Thank you. Would you give Mr. Ray, Mr. Reines' time as well so he'll have seven minutes, actually, if he needs it. Thank you. It is a bit confusing because the means for cross-referencing claims were not asserted against all parties. They were asserted against my client, not the patent, for example. To affirm across the board under this court's case law, yes, you would have to also affirm the invalidity of those few claims that do require the means for cross-referencing. And with regard to... that have that and not others? Yes, the claims that are issued on the means for cross-referencing are the 057 patent claims 11 through 13, the 362 patent claim 8. And those claims were not asserted against, for example, Apple and Pomp, but they were asserted against my client, Toshiba, and others. So a complete affirmance would require affirming the district court on invalidity as well, although non-infringement would also be appropriate. On the means for cross-referencing, while we're on that subject, Judge Rader, you raised a good point about the chart on pages 49 and 50 of the Blue Brief. That's a very creative chart. However, I do want to note that that chart is not in the patent, and particularly what's in the boxes is not in the patent. Isn't it pretty much excerpted out of a section of the patent, though? Well, depending on what you mean by pretty much, and as I look at the patent, I mean, if I look at the... For example, the question mark, the most important part of a decision-treating algorithm is the question mark. The question mark is nowhere in that patent. Neither is the no branch, where it says no, therefore no action. That is not in the patent either. So the other portions are simply a repeating of the function. So I believe this Court's aristocrat case is right on the money. The district court applied that case where there is a concession, there's no algorithm, and we're not discussing the... Well, it wasn't exactly a concession, there's no algorithm, and there's no explicit algorithm. I mean, at least in the briefing, they talk about pictorially depicting an algorithm, even if they don't explicitly disclose it. You know, aristocrat doesn't necessarily preclude us from including that, right? Well, they did take the position now that I understand their briefs, that it's in prose, and what they meant, it wasn't an algorithm explicitly. However, the only prose... Would one of skill in the art recognize it as such? That's our question. Well, I think... Get me a computer programmer, read that to them, are they going to say, give me 10 minutes, Mr. Ray, I can have that software to you quickly. Great enablement argument. That's an enablement. That's saying it's enabled. But 112 paragraph 6 requires much more than mere enablement. It requires a direct association and link to a disclosed algorithm under WMS gaming in this court's case law. So it's not an enablement issue, which is the way the blue brief reads. It is a 112 paragraph 6 requiring direct association... We're just asking if they recognize a structure. Clearly, if they can enable it, they recognize a structure, right? So I want to step further, if anything, didn't I? No, I think you want to step back. Enablement, I think, is easier because you can resort to general knowledge of those of skill in the art, whereas in 112 paragraph 6 the requirement to show specific structure is a requirement of 112 paragraph 6, and therefore, if you don't meet that requirement of associating specific structure, you have indefiniteness as a matter of law. And that is not... But if the question is, would one skill in the art read this as providing sufficient structure, that's the appropriate question, not with respect to enablement, but with respect to indefiniteness, right? That's correct. And I think the district court, Judge Davis, was absolutely correct. No one of skill in the art would think there is structure or an algorithm when all the language is a restatement of the function. See? And that's why the decision tree on page 50, this makes it look more like an algorithm, but this decision tree is not in the specification, that question mark is not in the specification, the no action box is not in the specification, and the other portions on page 50 are simply repeats of the function itself. The other argument I was prepared to address, which didn't come up in the argument, is keyboardless, another ground of affirmance for many of the products, but not all. If this court agrees with Mr. Reines, particularly with the means for executing, that would be an affirmance on non-infringement. If there's no further questions, on keyboardless... Thank you, Mr. Wright. Thank you, Your Honor. Mr. Wolf, you have two and a half minutes. I want to start off by either correcting opposing counsel or correcting myself for misspeaking. I did not intend to imply that I was saying that every general purpose computer today would meet these claims. What my point was, was it's really not relevant whether every general purpose computer would meet these claims or not. The issue is, what was new and non-obvious in 1988? Isn't that background section that Mr. Reines pointed us to at least suggest that there were computers that were not specially adapted for the DCA functions? It talked about laptop computers that would not be keyboardless in our definition.  that distinguish from those types of computers. So when you look at the claims, and all the elements of the claims, the keyboardless, having the application generator on the device, all of those claims define a novel invention as of 1988. But your theme now is that keyboardless doesn't mean keyboardless. That's just an embodiment. Keyboardless means that the device doesn't require a keyboard for use because it has a touchscreen on it. All the claims require there to be a touchscreen. So keyboardless means you can use the device without having to have a keyboard. The patent specification makes it very clear that reducing the need to use a keyboard was the point of the invention, not eliminating the keyboard. The specification makes it very clear that you can hook the device up to an external keyboard. The touchscreen can produce a simulated keyboard. So there can be a keyboard used for certain situations where a keyboard is needed. But it's not necessary to have a keyboard to use the device, and therefore saying that we're going to exclude a mechanically integrated keyboard from the definition of keyboardless, but allow the definition of keyboardless to read on using a peripheral keyboard or a simulated keyboard doesn't make any sense. The point of the invention was to have a device that would work without requiring a keyboard, not eliminate a keyboard. And so therefore, when you have that keyboardless function read that way, in 1998, looking at the other features of the claim, we have a novel invention. And the fact that now, 20 years later, the industry has moved to the point where now there are many devices that meet the limitations of these claims, well, that shows that this was a very important invention in the 1980s. Thank you, Mr. Wolf.